**UPPER WEST FORK RIVER WATERSHED ASSOC., By Kenneth Parker, President Lewis County, West Virginia, Plaintiff,**

v.

**CORPS OF ENGINEERS, UNITED STATES ARMY et al., Defendants.**

**Civ. A. No. 74–140–E.**

United States District Court,
N. D. West Virginia,
Elkins Division.

May 3, 1976.

---

LaVerne Sweeney, Grafton, W. Va., for plaintiff.

James F. Companion, U. S. Atty., Wheeling, W. Va., for defendants.

## MEMORANDUM ORDER

MAXWELL, Chief Judge.

Plaintiff, the Upper West Fork River Watershed Assoc., essentially seeks to enjoin further work on the Stonewall Jackson Lake Project in Lewis County, West Virginia, until alleged deficiencies in the environmental impact statement (the "EIS") relating to the project are cured.[1] The lake project, to be completed by the U. S. Army Corps of Engineers, will require approximately 21,000 acres of privately owned land in the West Fork River basin. The project is for flood control and other purposes; its dam will create a lake of 3,470 acres when at full pool.

Plaintiff is a West Virginia corporation with 597 members, 75 per cent of whom own real estate in the project area. Plaintiff's express purpose is to "encourage and promote" a watershed project on the tributaries of the West Fork River and thus avoid losing the lands of its members through eminent domain proceedings to the

---

1. Plaintiff also seeks to have the Court determine that the project is being carried out in violation of the Fifth and Ninth Amendment rights of its members.

Stonewall Jackson Lake Project. (Plf.'s Interrog. Ans. 2 and 4; Compl., par. 2.)

Named as defendants are the U. S. Army Corps of Engineers (the "Corps"), the United States Army itself, the United States Department of Defense, and three individuals who occupied official positions when the complaint was filed: James R. Schlesinger, then Secretary of Defense; W. G. Delbridge, then the Corps' District Engineer for the Pittsburgh District, and Howard H. Callaway, then Secretary of the Army.

### Development of the Litigation; the Record

Plaintiff, in its complaint filed July 11, 1974, alleges jurisdiction under 5 U.S.C. § 701 et seq. (review of agency action), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgment), 42 U.S.C. § 4321 et seq. (National Environmental Policy Act, "NEPA"), and the Fifth and Ninth Amendments to the United States Constitution.

In the first cause of action, Plaintiff attacks the adequacy of the EIS filed by the Corps concerning the project. Plaintiff alleges that the EIS is "vague; incomplete; misleading; erroneous" and "conclusionary." Plaintiff further claims that the EIS is "non-reviewable . . . in its present form" and does not comply with either the requirements of 42 U.S.C. § 4321 et seq. or the guidelines of the Council on Environmental Quality (the "CEQ"). (The final EIS, which the Corps filed with the CEQ on October 6, 1971, is attached to the complaint as an exhibit.)

In its second cause of action, plaintiff asserts that the "decision of the defendants to undertake the said project is not in substantial compliance with the goals Congress declared in 42 U.S.C. 4321 et seq."

Finally, in the third cause of action, Plaintiff claims that pursuit of the project, especially in light of the present EIS, violates Plaintiff's Fifth and Ninth Amendment rights.

Plaintiff seeks (1) a temporary injunction to prevent further action on the lake project; (2) an order directing the Defendants to prepare a new EIS which will cure the alleged deficiencies in the present statement; and (3) a determination whether Defendants are violating Plaintiff's rights under the Fifth and Ninth Amendments and under 42 U.S.C. § 4321 et seq.

The Defendants answered on September 16, 1974, denying the charging allegations of the complaint. On November 15, 1974, the Defendants directed extensive interrogatories to Plaintiff, which were answered on December 27, 1974. The Plaintiff filed supplemental answers to four interrogatories on December 22, 1975.

On December 12, 1974, Plaintiff's counsel deposed George Cingle, Jr., Chief of the Planning Branch of the Corps' Engineering Division in Pittsburgh. At the request of Plaintiff's counsel, the Corps' January 1971 General Design Memorandum, which is essentially the project plan, was attached to the transcript of the Cingle deposition. The deposition and attachments were filed and are part of the record.

A hearing on Plaintiff's motion for a preliminary injunction was set for November 21, 1975. Prior to the hearing date, the parties "agreed that in lieu of the hearing . . . the issues raised in this litigation can be submitted to the Court for decision by way of cross-motions for summary judgment." The agreement of the parties is reflected in the Court's November 21, 1975, order.[2] Pursuant to the order, the Defend-

---

2. The November 21, 1975, order, in its entirety, is as follows:

#### ORDER

Upon receiving the Court's Order entered on November 7, 1975, counsel for the plaintiff and defendants have conferred and have agreed that in lieu of the hearing scheduled for November 21, 1975, the issues raised in this litigation can be submitted to the Court for decision by way of cross-motions for summary judgment. Based upon the agreement of counsel and the Court perceiving no objection, it is therefore

ORDERED that the hearing previously scheduled for November 21, 1975 is cancelled. It is further

ORDERED that the defendants shall file their motion for summary judgment with

ants filed their motion for summary judgment on December 15, 1975. With the motion, the Defendants, under the affidavit of Colonel Max R. Janairo, Jr., the Corps' District Engineer (Pittsburgh District), filed a document dated November 1975 and entitled "Review of Environmental Features Relating to the Stonewall Jackson Lake Project" (hereinafter the "1975 Review"). (Map folios attached to the 1975 Review were also filed.) The Plaintiff filed its cross-motion for summary judgment on January 5, 1976. With the motion, Plaintiff filed the affidavits of (1) its president, Kenny Parker, (2) M. S. Holt, Jr., one of Plaintiff's members who is a civil engineer, (3) Clara Mae Spray, another of Plaintiff's members, and (4) Dr. S. Thomas Bond, an inorganic chemist. (Maps concerning coal reserves accompany the Bond affidavit.) Plaintiff also filed several documents: a map folio styled *Development of Water Resources in Appalachia* (Exhibit A); A Comptroller General's report: *Improvements Needed in Making Benefit-Cost Analyses for Federal Water Resources Projects* (1974) (Exhibit 2); and a book entitled *Comprehensive Survey of the Monongahela River* (1973), prepared by the West Virginia Department of Natural Resources (Exhibit 3).

Both sides submitted briefs in support of their motions for summary judgment and, in addition, the Court has had the benefit of a brief submitted by several organizations who appear *amici curiae,* namely, the Clarksburg Chamber of Commerce, the Association for Industrial Development of Harrison County, the Lewis County Chamber of Commerce and the Buckhannon Chamber of Commerce.[3]

■ In this action Plaintiff focuses its attack on the EIS filed by the Corps. As is detailed more fully, *infra,* the Court's review must focus upon the EIS itself and the information which the Corps compiled and utilized. This includes all studies and reports which affect the content of the EIS. *See Afton Alps, Inc. v. United States,* 392 F.Supp. 543, 550–51 (D.Minn.1974). One important document, a 1966 Corps report on the West Fork River and its tributaries, was not submitted to the Court by the parties, although it was brought by reference to the Court's attention. The report, a public Congressional document, is entitled *West Fork River and Tributaries, West Virginia,* S.Doc.No.109, 89th Cong., 2d Sess. (1966). This report (hereinafter the "1966 Report") is identified in the General Design Memorandum (page 7) as "the project document" and "the basis for the West Fork River Basin . . . legislative action." Because of the importance of this public document, the Court has obtained a copy, and the Clerk will be directed to file the same as part of the record.

■ A final observation concerning the record is needed. The Plaintiff has moved to strike from the record the Corps' 1975 Review which Defendants submitted with their summary judgment motion under the affidavit of Colonel Janairo, the Corps' District Engineer. Plaintiff objects to the 1975 Review, claiming that it is an improper attempt to supplement the EIS with uncirculated material.[4] In their reply brief, De-

---

brief in support thereof on or before December 15, 1975 and that the plaintiff shall file its cross-motion for summary judgment and brief in support thereof on or before December 31, 1975.

ENTER: November 21, 1975
/s/ ROBERT E. MAXWELL
United States District Judge

Endorsement of Counsel:
/s/ LaVerne Sweeney
Attorney for Plaintiff
/s/ William A. Kolibash
Attorney for Defendants

3. On November 17, 1975, the four *amici curiae* organizations moved for an order permitting them "to participate in all further proceedings" in this case. The motion was served on all counsel and, receiving no objection from either side, the Court, on November 24, 1975, entered an order permitting the four organizations to participate in this case as *amici curiae.* The four organizations support the lake project and urge that summary judgment should be awarded to the Defendants.

4. An EIS may be amended or supplemented if the amendment or supplement is "subjected to

fendants readily concede that the 1975 Review is not a supplement to the EIS. Instead, the 1975 Review is simply offered to support conclusions in the EIS. Under such circumstances, it seems proper, since documents identified by affidavit may be submitted to support a motion for summary judgment, that the 1975 Review remain in the record unstricken. *Pollack v. City of Newark, N. J.,* 147 F.Supp. 35, 39 (D.N.J. 1956), *aff'd,* 248 F.2d 543 (3rd Cir. 1957), *cert. denied,* 355 U.S. 964, 78 S.Ct. 554, 2 L.Ed.2d 539 (1958), *reh. denied,* 362 U.S. 907, 80 S.Ct. 614, 4 L.Ed.2d 558 (1960); 10 Wright & Miller, *Federal Practice and Procedure* : Civil § 2722. Of course, Plaintiff was free to respond to the Janairo affidavit and the 1975 Review as provided by Rule 56(e), F.R.Civ.P. However, the Court notes that the 1975 Review is basically cumulative and is unessential to the Court's decision in this case.

*The Propriety of Summary Judgment*

As noted, this case is before the Court on cross-motions for summary judgment. The parties, including the Plaintiff, expressly indicated that they did not desire an evidentiary hearing and agreed that the entire case should be submitted for decision on cross-motions for summary judgment. (*See* footnote 2, *supra.*) In its motion, Plaintiff asserts that there is "no genuine issue as to any material fact." However, in its brief, Plaintiff may imply a somewhat different position. Plaintiff may be urging in its brief that it can be awarded summary judgment but that summary judgment for the Defendants would be improper because material factual issues stand in the way. There is no proffer by Plaintiff, however, of such material factual issues, nor are there inferences from which such could arise.

In the absence of Plaintiff's bringing material factual issues to the Court's attention, and after a careful search by the Court for such, the Court considers this a proper case for summary judgment and further concludes that summary judgment should be granted in favor of the Defendants for rea-

sons which appear in detail in this memorandum.

 This case is chiefly an attack on the EIS, and the Defendants of course claim that the EIS is adequate within its four corners. In seeking summary judgment, the Defendants rely upon the EIS, studies conducted by the Corps, and information and data compiled by the Corps. This material is before the Court and is, in effect, the administrative record, informal though it may be. *See Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). To oppose successfully the Defendants' motion for summary judgment, it was incumbent upon Plaintiff to meet the Corps' material head-on and "set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), F.R.Civ.P.; *see Atlantic States Const. Co. v. Robert E. Lee & Co., Inc. of S. C.,* 406 F.2d 827 (4th Cir. 1969). Rule 56(e) provides, in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

The Rule 56(e) reference to "specific facts" requires the opponent of summary judgment to "giv[e] body to" and "augment the bald assertions" of his pleadings. *Williams v. The Board of Education of County of Kanawha,* 530 F.2d 972 (4th Cir. 1975). He must respond with substantial and concrete particulars to establish that there is a genuine issue for trial; general assertions are inadequate. *Atlantic States Const. Co. v. Robert E. Lee & Co., Inc. of S. C., supra,* 406 F.2d at 829; *Waldron v. British Petroleum Co.,* 38 F.R.D. 170 (S.D.N.Y.1965), *aff'd sub nom., Waldron v. Cities Service Co.,* 361 F.2d 671 (2d Cir. 1966), *aff'd sub nom., First*

the . . . comment and review procedures outlined by Section 4332(2)(C) of NEPA." *Nat-*

*ural Resources Defense Council, Inc. v. Morton,* 337 F.Supp. 170, 172 (D.D.C.1972).

*Nat. Bank v. Cities Service,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569, *reh. denied,* 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968).

■ The instant case is not one which presents conflicting factual inferences of a material nature, nor is it a case where credibility (and therefore witness demeanor) appears to be an important factor. *See Atlantic States Const. Co., supra,* 406 F.2d at 828–29. In addition, *de novo* review is unwarranted. Instead, this case must focus on administrative action which was clearly documented prior to the start of this litigation. This appears then to be the type of case in which summary judgment procedures have especial utility. *See generally Friends of the Earth v. Coleman,* 513 F.2d 295 (9th Cir. 1975); *Bank of Commerce of Laredo v. City Nat. Bank of Laredo,* 484 F.2d 284 (5th Cir. 1973), *cert. denied,* 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974).

■ The affidavits and documents presented by Plaintiff are not enough to forestall the award of summary judgment to the Defendants. Plaintiff's materials, when applied to the gravamen of the complaint, do not show sufficient factual particulars to establish that there are genuine issues for trial. And Plaintiff has had sufficient time to discover and develop evidentiary data. The Court is convinced that a trial in this case would be a useless formali-

ty because there has been decidedly no showing that a trial would produce any different or additional evidence. *See Lundeen v. Cordner,* 354 F.2d 401 (8th Cir. 1966). In sum, the Court is convinced to a legal certainty that Plaintiff has no triable controversy.[5]

### The Standard of Review

■ The standard for judicial review of the informal agency action in this case is determined by Section 706 of the Administrative Procedure Act (5 U.S.C.). It is clear that neither application of the "substantial evidence" test, § 706(2)(E), nor *de novo* review, § 706(2)(F), is authorized in this case. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413–17, 91 S.Ct. 814, 822–24, 28 L.Ed.2d 136, 151–54 (1971).[6] However, here, as in all cases in which agency action is challenged, the action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (§ 706(2)(A)), or if the action fails to meet constitutional (§ 706(2)(B)), statutory (§ 706(2)(C)), or procedural (§ 706(2)(D)) requirements. *Overton Park, supra,* at 413–14, 91 S.Ct. at 822–23, 28 L.Ed.2d at 151–52.[7]

In applying the applicable standards, the Court has "engage[d] in a substantial inquiry," conducting a "thorough, probing, in-

---

**5.** In reaching this conclusion the Court has been mindful of the principle that "any doubt as to the existence" of a genuine issue of fact must be resolved against the party seeking summary judgment. The "[b]urden is upon the party moving for summary judgment to demonstrate clearly" that no such issue exists. *Phoenix Savings and Loan, Inc. v. Aetna Casualty & Sur. Co.,* 381 F.2d 245, 249 (4th Cir. 1967).

**6.** 5 U.S.C. § 706(2)(E) and (2)(F) have limited applicability, as explained in *Overton Park, supra,* 401 U.S. at 410–417, 91 S.Ct. at 820–824, 28 L.Ed.2d at 149–154.

**7.** The applicable portion of the Administrative Procedure Act provides:
§ 706. Scope of review
To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the

terms of an agency action. The reviewing court shall—
\* \* \* \* \* \*
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
\* \* \* \* \* \*
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. (5 U.S.C. § 706.)

depth review" to determine whether the agency action is in accord with the particular Congressional act, here NEPA. *Overton Park, supra,* 401 U.S. at 415, 91 S.Ct. at 823, 28 L.Ed.2d at 153. The Court has especially noted the teaching of the Fourth Circuit which imposes upon " 'District Courts . . . an obligation to review substantive agency decisions on the merits' " in NEPA cases. *Conservation Council of North Carolina v. Froehlke,* 473 F.2d 664, 665 (4th Cir. 1973). *Accord, Fayetteville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021, 1024 (4th Cir. 1975).[8]

■ Finally, in its inquiry, the Court has followed the instruction of the Supreme Court that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106, 111 (1973). *Accord, Fayetteville Area Chamber of Commerce v. Volpe, supra,* 515 F.2d at 1024. The record of Corps action here, of course, is informal, but the Court has been furnished the EIS itself, together with the studies and data available to the Corps when the EIS was written, including comments obtained from appropriate governmental agencies.

### General Background and Project Authorization

The history which ended with Congressional authorization of the Stonewall Jackson Lake Project is a matter of public record and is undisputed here.

Since early in this century the United States Congress has been actively interested in a reservoir-lake project on the West Fork River, which is part of the Ohio River Basin.

In the 1920's Congress authorized the Corps to conduct a major study of the Ohio River Basin.[9] Results of the study were published in 1935. (H.R.Doc.No.306, 74th Cong., 1st Sess. (1935).) The study included a comprehensive plan for developing the streams of the Ohio River Basin in respect to flood control, water power and navigation. The plan included the recommendation for a flood control reservoir on the West Fork River between Weston and Clarksburg, West Virginia. This particular reservoir project was authorized by the Flood Control Act of 1936 (Act of June 22, 1936, ch. 688, § 5, 49 Stat. 1570), and reaffirmed in the Flood Control Act of 1938 (Act of June 28, 1938, ch. 795, 52 Stat. 1215). After "considerable sustained local opposition" to the site between Weston and Clarksburg, the Corps apparently assigned the project low priority status.[10] Further studies resulted from a flood control act approved in 1941 (Act of Aug. 18, 1941, ch. 377, 55 Stat. 638). That act sought a determination of "the advisability of constructing a *system* of multiple-use reservoirs" in the West Fork area. (Emphasis added.)

The Corps investigated seventeen possible sites throughout the West Fork basin. The

---

**8.** The Fourth Circuit's call for "review . . . on the merits" requires the Court to proceed cautiously because of the Supreme Court's stated limits on review under 5 U.S.C. § 706(2)(A):

> Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. (*Overton Park, supra,* 401 U.S. at 416, 91 S.Ct. at 824, 28 L.Ed.2d at 153.)

The use of the phrase "review on the merits" and what it means in NEPA cases are a source of much confusion. *See, e. g., Environmental Def. F., Inc. v. Corps of Eng. of U. S. Army,* 492 F.2d 1123, 1139 (5th Cir. 1974); *Environmental Defense Fund v. Corps of Eng., U. S. Army,* 470

F.2d 289, 299 n.15 (8th Cir. 1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973); *National Helium Corporation v. Morton,* 486 F.2d 995, 1006 (10th Cir. 1973) (concurring opinion), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974).

**9.** Specifically, the study was authorized pursuant to Corps' recommendations appearing in House Document No. 308, 69th Cong., 1st Sess. (1926). This authorization was formalized in the Rivers and Harbors Act of 1927 (Act of Jan. 21, 1927, ch. 47, § 1, 44 Stat. 1010), and reemphasized in the Flood Control Act of 1928 (Act of May 15, 1928, ch. 569, § 10, 45 Stat. 534).

**10.** H.R.Doc.No.491, 83rd Cong., 2d Sess. 4, 9 and 146 (1954).

Corps concluded that a system of reservoirs was not advisable and recommended a single, large reservoir, for flood control and other purposes, on the West Fork with the dam near Brownsville, West Virginia, the current site. (H.R.Doc.No.491, 83d Cong., 2d Sess. 89, 146 (1954).) As a result of these studies the project initially authorized by Congress, *i. e.,* the reservoir between Clarksburg and Weston, was placed in the inactive category in February 1961. (1966 Report, p. 15.)

On June 29, 1962, the United States Senate Committee on Public Works adopted a resolution calling for still further studies of the West Fork basin. The resolution provides in pertinent part:

> [T]hat the Board of Engineers for Rivers and Harbors . . . be and is hereby, requested to review the reports of the Chief of Engineers on the Ohio River and tributaries, as contained in House Document numbered 306, Seventy-fourth Congress, first session, and other reports, with a view to determining whether the existing project [*i. e.,* the reservoir between Weston and Clarksburg] should be modified in any way at the present time, with particular reference to construction of a reservoir on the West Fork River (Stonewall Jackson Reservoir), in the vicinity of Brownsville, West Virginia, for flood control, water supply, stream flow regulation, recreation, and related purposes. (1966 Report, p. 14.)

Pursuant to the 1962 resolution, the Corps engaged in detailed studies of all methods of controlling flooding, providing water supply, et cetera, including construction of a system of multiple reservoir sites on tributaries in the West Fork basin. The studies were completed with the recommendation that the Stonewall Jackson Lake Project be authorized. (The studies and recommendations appear in the Corps' 1966

Report, referred to above and made part of the record.)

The Stonewall Jackson project for flood protection, water quality control, water supply, and recreation in the West Fork basin was authorized for construction by the Flood Control Act of 1966 (Act of Nov. 7, 1966, Pub.L.No.89–789, § 203, 80 Stat. 1405). With this Congressional authorization, the Corps' Pittsburgh Engineer District initiated the preparation of the project's General Design Memorandum ("GDM") which was completed in January 1971, and is the basis for continuing planning and design. (*See generally* Cingle Dep.)

Land acquisition and construction is being delayed because the State of West Virginia has not signed a cost sharing agreement for the development of the project's recreation facilities. This agreement has been in the hands of West Virginia officials since April 18, 1973, when it was submitted in final form for execution and approval.[11] (Cingle Dep., pp. 25–26 & Supp.)

### Project Scope

The general site of the Stonewall Jackson Lake Project is Lewis County, West Virginia. The reservoir will collect water from a drainage area of 102 square miles. Plans specify a concrete gravity dam 620 feet long with a height above streambed of 95 feet. The dam site is near Brownsville, three miles south of Weston, and about 73 miles upstream from the mouth of the West Fork River, a tributary of the Monongahela. At full pool, the reservoir will make a lake of 3,470 acres, although full pool will apparently occur infrequently. About 21,000 acres will be required for the project, including 1,140 acres for recreational use. The project will eliminate 35 miles of free flowing stream. Apart from its flood control and recreational aspects, the project is also to improve water quality control and

11. By letter to the Corps, dated July 7, 1970, West Virginia Governor Arch A. Moore, Jr., stated that "[i]t is the intention of the State of West Virginia to participate in the recreational development of the project and to assume the responsibility for its operation and mainte-

nance . . . .." (GDM, Exh. A.) The formal commitment, however, has not been made: in its brief (p. 4) the Government states, "To date, no word has been received from the State of West Virginia as to when the recreation cooperation agreement will be approved."

water supply for downstream areas. (EIS, pp. ii, 1.)

Total project cost, based on July 1974 prices, is estimated at $106 million. (Cingle Dep., p. 77.)

### The Environmental Impact Statement

The EIS was prepared by the Corps' Pittsburgh District. A draft EIS was submitted to the Council on Environmental Quality on September 24, 1971. The final statement, consisting of 15 pages and several attachments totaling 14 pages, was submitted to the CEQ on October 6, 1971. Before the EIS was submitted to the CEQ, a draft was sent to the following agencies for comment: Soil Conservation Service (U. S. Department of Agriculture); Department of Natural Resources (State of West Virginia); Bureau of Outdoor Recreation (U. S. Department of the Interior); Federal Water Quality Administration (Environmental Protection Agency); and The Appalachian Regional Commission. Before submission, the EIS was revised to conform to the comments of these agencies; the comments are attached to the EIS. (EIS, pp. ii, 11.)

### THE COMPLAINT AND THE SUMMARY JUDGMENT MOTIONS

#### I. THE FIRST CAUSE OF ACTION.

For ease of reference the Court will adopt the subject headings advanced by Plaintiff's Brief, considering them in turn.

■ Rule 7(b)(1), F.R.Civ.P., requires that a motion "state with particularity the grounds therefor." This provision applies to motions for summary judgment. 6 J. Moore, *Federal Practice* ¶ 56.14[1], at 56–354 (2d ed. 1976). Neither side in this case presented a motion document which conformed to the foregoing rule. This required the Court, particularly in Plaintiff's case, to examine the briefs for grounds which might support the motions. In this examination, the Court discovered that some of the particulars of Plaintiff's complaints about the EIS appear for the first time in its brief. The Defendants, however, raise no objection to the Court's consideration of these matters. While statements in briefs cannot be given the dignity of pleadings, the Court has considered everything in Plaintiff's brief, even though it is debatable whether all arguments advanced flow logically from Plaintiff's very general pleadings.

#### A. Alternatives.

Plaintiff's major claim appears to be that the EIS is incomplete and defective because it fails to discuss a watershed project as an alternative to the single dam at Brownsville. (Plf.'s Interrog. Ans. 14(b)(1).) Specifically, Plaintiff says that the NEPA and CEQ Guidelines were violated because the EIS "fail[ed] to analyze the watershed, its cost and its environmental impact." (Plf.'s Interrog. Ans. 15(e); *see* Interrog. Ans. 16(a).)

Plaintiff supports a watershed program, arguing that such a program would not displace people, and unlike the proposed Stonewall Jackson dam, would not inundate a large area, destroying "timber, cemeteries, schools, churches [and] coal." (Plf.'s Brief, p. 7.)

■ The provisions of NEPA, 42 U.S.C. § 4332, applicable to alternatives, provide: [A]ll agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

\* \* \* \* \* \*

(iii) alternatives to the proposed action

· · · ·

\* \* \* \* \* \*

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources

· · · ·

The pertinent 1971 CEQ Guideline, 6(iv), states:

A rigorous exploration and objective evaluation of alternative actions that might avoid some or all of the adverse environmental effects is essential. Sufficient analysis of such alternatives and their costs and impact on the environment should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might have less detrimental effects. (36 Fed.Reg. 7725, April 23, 1971).[12]

Reduced to its simplest meaning, the NEPA requires that "a detailed statement . . . on . . . alternatives to the proposed action" be included in the EIS. Courts have widely held that "[a] rule of reason is implicit in this aspect of the law"; that is to say, only responsible and reasonable alternatives need be discussed. *E. g., Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 834 (1972). *Accord, Fayetteville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021, 1027–28 (4th Cir. 1975).

It is undisputed that a watershed project, as such, is not listed as an alternative in the EIS. Five alternatives are considered: (1) no action, (2) flood plain management, (3) single reservoirs at a number of other sites, (4) channel improvement, and (5) diversion of waters of the Buckhannon River. (EIS, pp. 8–9.)

Parenthetically, it is necessary to define the term "watershed program". It appears reasonably clear from the record that the parties agree that a watershed program or project is basically a system of small dams. M. S. Holt, Jr., a civil engineer, in his affidavit (filed by Plaintiff) states: "small dams as used in watershed projects [are] a good way to provide flood protection." Mr. Cingle, Chief of the Planning Branch of the Corps' Engineering Division in Pittsburgh, upon being deposed by Plaintiff, testified that: "Basically, a watershed protection

project would consist of small dams." (Dep., p. 39.)

In this case the Court must examine the information amassed by the Corps prior to the filing of the EIS to determine why a "watershed program", as such, was not listed as an alternative. Corps studies of the West Fork area nearest in time to the EIS appear in the 1966 Report, which the Corps prepared in response to the June 1962 resolution of the U. S. Senate Committee on Public Works. The 1966 Report includes studies and data about the following aspects of the West Fork basin: topography, hydrology, flood damage, geology, water quality and quantity, area economic development, natural resources, agriculture, and runoff and streamflow characteristics.

The 1966 Report also includes an extensive discussion of alternatives to the Stonewall Jackson dam, including the feasibility of a system of small dams in the West Fork basin:

17. ALTERNATE SOLUTIONS CONSIDERED

17–1. *West Fork River basin reservoirs.* Extensive studies to determine the advisability of constructing a *system* of multiple-use reservoirs have been made. Investigation has been made of possible reservoir sites throughout the West Fork River system. . . . [I]nvestigation resulted in the selection of 17 reservoir sites for study—three on the West Fork River and 14 on tributaries. . . .

\* \* \* \* \* \*

17–3. Studies to determine the advisability of constructing a *system* of single-purpose reservoirs for flood control for the West Fork River basin have also been made. Potential reservoir sites listed in the above tabulation were investigated. An examination of the economic aspects of these reservoirs indicated that none could be economically justified and that the cost to develop two or more reservoirs

---

**12.** CEQ Guidelines "are advisory, not mandatory." *Continental Ill. Nat. B. & T. Co. of Chicago v. Kleindienst,* 382 F.Supp. 107, 114 (N.D.Ill.

1973). *Accord, Sierra Club v. Lynn,* 502 F.2d 43, 58 (5th Cir. 1974), *cert. denied,* 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484 (1975).

to form a system would far exceed the benefits that could be derived.[13]

17-4. In regard to water quality control, the Brownsville site is the most economical and best suited for a reservoir capable of providing the desired low-flow augmentation. Construction of an alternate single-purpose reservoir on Polk, Stonecoal, Hackers, Freemans, Sycamore or Kincheloe Creeks or a *system* of small single-purpose water quality reservoirs on these streams capable of providing the required low-flow augmentation on a firm basis would be more costly than reservoir development at Brownsville. Reservoir development on Simpson, Elk, Tenmile, Bingamon or Booths Creeks would not satisfy the needs of the basin because they would only affect the lower portion of the basin and also would not be desirable due to prevailing acid conditions of the streams. It also can be pointed out that in order to satisfy the water quality needs of the Weston area, reservoir development upstream from Weston is necessary. (1966 Report, pp. 39, 42; emphasis supplied.)

The 1966 Report concluded (p. 51):

22-1. *Best suited plan of improvement.* A single reservoir on the West Fork River with the dam located at Brownsville would be more economically adaptable to multiple-use than any other single reservoir or system of reservoirs which might be provided in the West Fork River basin. . . . The [Stonewall Jackson] dam and reservoir . . . represent[s] a project utilizing the site which yields the maximum net benefits attributable to the project purposes of flood control, water supply, water quality control and recreation. . . .

Mr. Cingle, in response to questioning by Plaintiff's attorney, confirmed that the Corps had considered and rejected a system of small dams. Mr. Cingle testified:

Our analysis of small dams would indicate that you could not provide the degree of flood protection for Weston and downstreams, that you could with the Stonewall Project. (Dep., p. 39.)

The foregoing excerpts from the 1966 Report and the Cingle deposition make it clear that the Corps fully studied a system of smaller dams; the Corps, however, concluded that such a system was not a reasonable alternative to the single dam site of the Stonewall Jackson Lake Project.

■ The Corps, in undertaking the authorship of the EIS, had the burden of meeting NEPA standards. But this does not mean that Plaintiff, in charging that the discussion of alternatives is inadequate, may rest upon the naked conclusion that a "watershed project" should have been listed in the EIS as an alternative.

Plaintiff has not pointed to any substantial particulars which would support its conclusion that a watershed project is a reasonable alternative to the Stonewall Jackson Lake Project. Plaintiff does offer two scant items on this issue: First, Mr. Holt's unsupported statement that "watershed projects [are] a good way to provide flood protection" (Holt Aff't); and, second, a citation to page 285 of Plaintiff's Exhibit 3, the West Virginia Department of Natural Resources survey, which states:

7. Water Resources Study staff members, SCS [Soil Conservation Service], Morgantown (West Virginia), in cooperation with the Forest Service and Economic Research Service, USDA, made water resource studies of eight additional watershed projects in the basin area as a part of their work on the Appalachia Water Resources Study. PL–566 projects were found to be *potentially* feasible in French Creek, Upper Buckhannon River, Sandy Creek, Three Fork Creek, Simpson Creek, Paw Paw Creek, Limestone Run, and *Upper West Fork River. All but the last appear feasible for three or more purposes, including flood prevention.* (Emphasis added.)

The above paragraph from the Department of Natural Resources survey is specu-

---

13. Data on the flood water storage capacities of the dams in the multiple-site reservoir system considered by the Corps appears in the 1966 Report, pp. 40–41.

lative and conclusionary: it speaks only of potentialities and does not refer to supporting data or documentation. The paragraph is of very minor, if any, assistance to plaintiff's cause for additional reasons. First, even giving Plaintiff the benefit of the doubt, it indicates that a watershed project on the West Fork River is "potentially feasible" for no more than two purposes, and it is not clear that flood control is one of those purposes. Congress has determined that the Stonewall Jackson project is needed for at least *four* specific purposes, including flood control. Second, it is significant that neither the U. S. Department of Agriculture's Soil Conservation Service (which is dedicated to watershed projects) nor the Department of Natural Resources (which published the survey referred to above) suggested a watershed project as an alternative in their comments on the draft EIS. A fair reading of the comments of these two agencies indicates support for the Stonewall Jackson project.[14] Indeed, none of the state or federal agencies which commented on the EIS suggested or even mentioned a watershed program as an alternative. *See Natural Resources Def. Coun., Inc. v. Tenn. Val. Auth.,* 367 F.Supp. 128 (E.D.Tenn. 1973), aff'd, 502 F.2d 852 (6th Cir. 1974).

Defendants, in their interrogatories numbered 5 through 13, sought to discover whether Plaintiff itself had taken any steps to determine the feasibility of a watershed program in the West Fork basin. Interrogatory 5 asked:

When did plaintiff first begin to plan construction of a watershed project on or about the Upper West Fork River as alleged in paragraph 9 of the Complaint?

Plaintiff replied:

In August of 1972 many of the late members of the corporation requested a watershed project through the West Fork Soil Conservation District and in May of 1973 an application was made for Federal assistance under the Watershed Protec-

tion and Flood Prevention Act which application was to see that a Watershed project was built *if a feasibility study for such found that it was warranted.* (Plf.'s Interrog. Ans. 5; emphasis added.)

Plaintiff admits that there have not been any actual feasibility studies, even now, of the watershed method it proposes. (Interrog. Ans. 11.) Moreover, there is no firm indication in the record as to when, if ever, such studies will be made.

In Interrogatory 12, Defendants asked for a description of the watershed project that Plaintiff proposes, including (1) "locations and areas of its drainage basins", (2) the "hydrologic and hydraulic characteristics of the watershed project", (3) "characteristics and locations of the structural and non-structural components of the . . . project", and (4) any "cost studies." Plaintiff answered: "We do not have this information at the present time." (Interrog. Ans. 12.)

The United States Senate Committee on Public Works, in its report accompanying the bill authorizing the Stonewall Jackson Lake Project, summarized the need for the project as follows:

*Flood problem.*—West Fork River and its tributaries overflow about once a year causing flood damage in the cities of Weston, Clarksburg, and Fairmont and in the smaller communities of Deanville, West Milford, Shinnston, Enterprise, Worthington, and Monongah. In addition, the uncontrolled discharges from the West Fork River contribute to downstream floods on the Monongahela River. Damages occur to industrial developments, commercial establishments, residential properties, and cultivated lands. Railroads, highways and utilities facilities are also adversely affected by floods. (Senate Comm. on Public Works, Public Works Authorizations, 1966, Rivers and Harbors—Flood Control and Multiple-

---

**14.** The Soil Conservation Service was specifically established to assist in carrying out the "declared . . . policy of Congress to provide permanently for the control and prevention of soil erosion and thereby to preserve natural resources, control floods, [etc.]." (The Soil Conservation Act of 1935, 16 U.S.C. § 590a.)

Purpose Projects, S.Rep.No.1720, 89th Cong., 2d Sess. 57 (1966).)

The project is also for "water supply, water quality control, recreation and area redevelopment." (*Id.*)

■ Plaintiff has not advanced anything substantial and dependable to indicate that the watershed idea is a reasonable or realistic alternative for meeting the Congressional objectives outlined above. The Corps, in its 1966 Report, considered and rejected a system of small dams (*i. e.*, a watershed project). Plaintiff has not "set forth specific facts showing that there is a genuine issue for trial" concerning whether a watershed project is a reasonable alternative. (Rule 56(e), F.R.Civ.P.) Accordingly, the Court concludes that the Corps' decision to omit a watershed project as an alternative in the EIS did not violate the applicable standards for agency action previously outlined in this memorandum.

### B. *Short Term Use Versus Long Term Productivity.*

■ Plaintiff apparently claims at this juncture that the EIS does not satisfy NEPA, 42 U.S.C. § 4332(C)(iv) which requires "a detailed statement by the responsible official on . . . the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity." This provision, according to CEQ Guideline 6(a)(v),

> . . . in essence requires the agency to assess the action for cumulative and long-term effects from the perspective that each generation is trustee of the environment for succeeding generations. (36 Fed.Reg. 7725 (1971).)

In addition, CEQ Guideline 5(c) interprets NEPA to mean:

> . . . that adverse significant [environmental] effects include those that . . . serve short-term, to the disadvantage of long-term, environmental goals. (*Id.*)

In its brief (pages 7–8), Plaintiff claims that the short-term/long-term use discussion in the EIS (par. 6) is deficient for several reasons which are considered in sequence.

First, Plaintiff charges that the Corps has no basis for stating in the EIS (page 10) that "a continuing gradual decline [in the project area] was indicated." The record establishes an undisputed factual basis for the statement. The Corps' 1966 Report reveals that the 1960 Census showed that population in the West Fork River basin area declined 10.7% in the decade between 1950 and 1960. (1966 Report, p. 23.)[15] More importantly, the indication of a "gradual decline" in the area was immediately followed in the EIS by a direct acknowledgment that the decline could end at any time, even in the absence of the dam project.

> This decline could possibly be retarded or even reversed as a result of Interstate 79. Either case, however, pertains to the immediate future, for population pressure will eventually require more intensive use of the 33 square mile area. (EIS, p. 10.)

Second, the Plaintiff attacks the EIS conclusion that "[t]he long term productivity of the area would be enhanced by the development of recreation areas." (EIS, p. 10.) Plaintiff states that "the proposed project will be made into another state park which plaintiff *believes* will be non profitable—in light of the fact that only two of our state parks are profitable."[16] (Emphasis added.)

---

**15.** The November 1975 Review reports 1970 Census figures showing that the population in Lewis County (the site of the dam) dropped 9.5 per cent between 1960 and 1970, and the population in Harrison County, the next county downstream from the dam, declined 6.2 per cent in the same period. (Page 26.) Plaintiff does not dispute these figures. The record does not indicate whether the 1970 Census fig-

ures were available to the Corps in October 1971 when the final EIS was filed.

**16.** Plaintiff's discussion about the profitability of parks relies on a letter from the Director of the West Virginia Department of Natural Resources. (Spray Aff't, Dec. 29, 1975, Exh. B.) The letter indicates that *three* state parks "operate at a profit during the normal years of operation."

Further, "[i]t is plaintiff's position that due to the energy crisis and recession there *may be* less use made of our state parks than projected in the EIS." (Plf.'s Brief, p. 7; emphasis added.) Apart from being based on mere "belief" and speculation, these assertions conveniently overlook several undisputed factors:

(1) The Corps does not promise that the operation of the park aspect of the project will turn a profit for West Virginia's treasury. Indeed, before construction begins, the State must agree to "bear all costs of operation, maintenance, and replacement of recreation facilities, the amount involved currently being estimated at $64,000 annually during the initial life of the project and $130,000 annually under conditions of full realization of the recreation potential of the project." (1966 Report, p. 71.)

(2) The EIS indication that the park aspect of the project will enhance long-term productivity of the area clearly looks beyond the issue of recreational profitability to the state. The EIS indicates that because of the project's convenient location "substantial recreation-oriented services in the vicinity" could be generated. (EIS, p. 5.) This is an obvious reference to private enterprise.

(3) The discussion of long-term productivity in the EIS goes far beyond recreational aspects of the project. For example, water supply is emphasized:

> [F]uture productivity of Clarksburg and Weston, West Virginia, will be affected by water supply for commercial and individual users. Based on two drought years, 1930 and 1953, and 1970 population, needs exceed supply available from natural flow and existing facilities for the City of Weston at present, and for Clarksburg in 1985. If these areas are to be productive, additional water supply is necessary. Demands to the year 2010 could be met by the proposed project. (EIS, p. 10.)

Plaintiff does not dispute the Corps' projections about water supply requirements.

Third, in its attack on the short-term/long-term use discussion in the EIS, Plaintiff claims that there was a failure "to balance expected project benefits '. . . against the permanent loss of free-flowing streams.' " (Plf.'s Brief, p. 8.) It goes without saying that expected project benefits are stressed in the EIS. However, a fair reading of the EIS as a whole reveals a reasonably balanced discussion between benefits and drawbacks. Loss of free flowing streams is discussed:

> [T]he loss of about 35 miles of free flowing streams will result from project construction. (EIS, p. 4.)

> \* \* \* \* \* \*

> Although the complete loss of any particular species of plant or animal life is not expected, it is realized that the inundation of wildlife habitat and free flowing stream will have an impact aesthetically. (EIS, p. 5.)

> \* \* \* \* \* \*

> Approximately 21 miles of stream fishing will be eliminated. . . . The ecological systems functioning within the stream and along its banks will be exchanged for systems associated with a slack water environment. (EIS, p. 7.)

Fourth, Plaintiff claims that the EIS "fails to balance expected project benefits '. . . against . . . the eventual uselessness of a dam as silt accumulates.' " This is an apparent attempt to elaborate on Interrogatory Answer 14(b)(11) in which Plaintiff says that the EIS "is felt to be incomplete because . . . [it] fails to discuss siltation problems in the proposed lake." The Corps makes no claim that the dam will last forever. Benefits are projected for a period of 100 years;[17] and Plaintiff offers nothing of significance to show that

---

17. The General Design Memorandum consistently speaks of a "100-year project life" (GDM, App. XII, p. 11; *see* GDM App. XI, p. 16; GDM App. I, p. 2); and a supplement accompanying the 1966 Report (p. x) estimates the project's "average annual cost" over "a 100-year project life."

siltation will make the dam useless prior to that time.[18]

Finally, on the subject of short-term/long-term use, Plaintiff attacks the EIS arguing that it "fails to discuss fully the effect on coal." Expressing a belief that "coal mining will increase," Plaintiff asserts that "[t]he EIS did not contemplate the energy crisis." (Plf.'s Brief, p. 8.)[19]

Plaintiff bases its comments about coal on the affidavit of Dr. S. Thomas Bond, an inorganic chemist who studies geology as a hobby. In his affidavit, Dr. Bond estimates the extent of coal reserves in Lewis County, West Virginia, and predicts that the "demand for coal will continue to increase indefinately [sic] in the future." (Aff't, p. 7.) Dr. bond is careful to concede that there is little mining activity in the area at present.

Plaintiff contends that "with the treatment of coal in the EIS, [it] is entitled to a summary judgment, especially in light of the affidavit of Dr. Thomas Bond." (Plf.'s Brief, p. 8.) The point of Dr. Bond's affidavit (page 7) is this: "If the dam is placed, part of the true cost of it is the coal." Dr. Bond's affidavit does not run counter to the Corps' treatment of coal. Before the EIS was prepared, the Corps computed the coal reserves in the project area; and the coal was included as a cost in figuring the project's cost-benefit ratio. Moreover, as Mr. Cingle indicated in his deposition, the Corps is fully aware "that there has been a substantial increase of the value of coal," and the Corps continues to refine the real estate costs (including coal) for this project. (Cingle Dep., pp. 76–78.)

Plaintiff's comments about coal ignore certain information it obtained in discovery. Mr. Cingle testified that mineral reserves, including coal, would

not [be] lost completely. If a situation were to occur then in a national interest to provide, or recover some of these particular resources, then a program could be developed for their recovery.

\* \* \* \* \* \*

[I]f it was such in a national situration [sic], or it be imperative that it would be mined, then we would provide a program. (Cingle Dep., pp. 20–21.)

On the basis of extensive studies, including appraisal and some core drilling near Brownsville, the Corps included the following in the EIS on coal:

Coal stripping and mining operations are characteristic of this part of the West Fork River Basin. Commercial activity within the project area has practically ceased. . . . Active production continues upstream from the project area, where reportedly 60 percent of the mineable coal remains. (EIS, p. 2.)

In light of the foregoing analysis of the coal resource in the EIS and the inclusion of coal as a cost in the cost-benefit ratio in the EIS, the affidavit of Dr. Bond does not establish that there is a "genuine issue for trial" concerning the treatment of coal. Indeed, nothing in the record suggests that coal was given a shoddy or inadequate evaluation.

### C. Public Involvement.

In its Interrogatory Answer 14(c), Plaintiff states:

The E.I.S. is felt to be misleading because of the following:

\* \* \* \* \* \*

2. On page 11 of the E.I.S. nearly one-half page is devoted to public participation in the decision to proceed with the

---

18. Plaintiff says that it bases its comments about siltation on "books critical of Corps projects" and Exhibit 7 to Plaintiff's motion. (Plf.'s Brief, p. 8.) Exhibit 7 is the affidavit of M. S. Holt, Jr., and that affidavit makes no mention whatever of siltation. Plaintiff's Exhibit 6, the affidavit of Dr. S. Thomas Bond, speaks briefly of siltation, but Dr. Bond's comments about siltation raise no material issue in

this litigation. In sum, Plaintiff has not established that siltation is an issue.

19. See also, Plaintiff's Interrogatory Answer 14(b)(8) which states:

The E.I.S. fails to discuss the impact on the existing resources, including coal, which will be irretrievably lost, and the nature of each such loss.

Stonewall Jackson Lake project but it fails to mention that the project was not the same. It is also misleading because there was no public participation in the revision of the draft E.I.S. to the final E.I.S. It is also misleading because the closest any of these hearings were was in Clarksburg.

■ Plaintiff's complaints about the public hearings are misplaced because neither the NEPA nor the CEQ Guidelines make public hearings a mandatory procedural requirement in the preparation of an environmental impact statement. *Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275, 1284–85 (9th Cir. 1973).

It is undisputed that five public hearings were held between 1941 and 1964. All hearings dealt with proposed reservoir construction in the West Fork River basin. The last three hearings specifically dealt with the Brownsville site; and at the final hearing, held in Clarksburg, West Virginia, on December 2, 1964, the plan for the presently authorized project was presented. (1966 Report, pp. 33–34.) [20] Three of the five public hearings were held in Clarksburg, which is within easy travelling distance from the area to be inundated; the September 24, 1954, hearing was held in Weston, which is about three miles from the dam site. (1966 Report, pp. 33–34; *see* EIS, p. 1.)

■ As noted, Plaintiff charges that "there was no public participation in the revision of the draft E.I.S. to the final E.I.S." This charge raises no issue for trial because the NEPA itself does not require that a draft EIS be prepared and filed. (Here, of course, a draft was filed and circulated among appropriate governmental agencies.)

■ Plaintiff's complaints about lack of public involvement in the revision process are an obvious effort to get this Court to turn back the clock on the EIS preparation process. Plaintiff states that its "legal existence had not been created until many months after the final impact statement was prepared." Plaintiff further claims that its "members were not even aware of environmental impact studies until plaintiff's counsel, who was not admitted to practice until May of 1973 and not aware of the project until sometime thereafter, asked plaintiff's members if such had been prepared." (Plf.'s Brief, p. 8.) None of this gives the Court a valid reason to invalidate the EIS. The fact that Plaintiff failed to participate as an entity in the EIS preparation process does not prevent Plaintiff and its members from addressing their recently expressed concerns to Congress, the body which determined that the dam is needed.

*D. Permanent Commitments of Resources.*

Plaintiff claims that:

the section of the E.I.S. entitled "Any Irreversible and Irretrievable Commitments of Resources Which Would be Involved in the Proposed Action Should It Be Implemented" is incomplete and does not provide for full disclosure. (Plf.'s Brief, p. 9; *see also,* Plf.'s Interrog. Ans. 14(b)(8).)

■ Specifically, Plaintiff believes that the EIS does not completely discuss alleged losses of coal, gas and oil resources. (Plf.'s Brief, p. 9.) Section 7 of the EIS clearly concludes that the commitment of resources in the project area will be "for the life of the project", which is estimated to be 100 years.

The Court has previously indicated in this memorandum that the EIS adequately deals with coal and that discussion need not be repeated here.

The effect on natural gas resources is fully discussed in Sections 2 and 3 of the EIS:

Development of natural gas resources began about 1900, and has continued to the present. Some of the wells have been exhausted, but some of these are still used for storage of gas obtained locally as

20. According to the 1966 Report (p. 34), the December 2, 1964, hearing in Clarksburg "was well attended"; and, "a few objections [were raised] by affected landowners to the project."

well as that transported from other states. The Equitable Gas Company has a large, active compressor station in the Skin Creek Valley well below the impoundment level. (EIS, p. 3.)

 \* \* \* \* \* \*

Active and inactive gas wells below the lake full pool elevation will be plugged; gas injection and recovery wells and gas storage observation wells will be protected and provided with access; a gas compressor station in the valley will be relocated. . . . (EIS, p. 4.)

The record is devoid of any indication that oil is an important resource in the project area.

It is undisputed that coal and gas reserves (and oil to the extent it exists) in the project area are "not lost completely", and thus not irreversibly or irretrievably committed. As noted earlier in this memorandum, if the national interest ever requires it, a program to recover these resources can be developed after the project is completed.[21] (Cingle Dep., pp. 20–21.)

In any event, Plaintiff has offered nothing of substance to raise a material issue about inadequate treatment in the EIS of resource losses caused by the project. It is undisputed that the loss of coal, gas and oil is treated as a cost in the cost-benefit ratio appearing in the EIS. (Cingle Dep. 20–22, 76–78.) The wisdom of a project which places certain resources beyond reach is not for the Court to consider. That is the responsibility of the ultimate decision maker—in this case, the Congress. *Cf. Environmental Defense Fund, Inc. v. Froehlke,* 368 F.Supp. 231, 240–41 (W.D.Mo.1973), *aff'd*

sub nom., *Environmental Defense Fund, Inc. v. Callaway,* 497 F.2d 1340 (8th Cir. 1974); *Cape Henry Bird Club v. Laird,* 359 F.Supp. 404, 412–13 (W.D.Va.), *aff'd,* 484 F.2d 453 (4th Cir. 1973).

### D. *Comments.*

The NEPA, 42 U.S.C. § 4332(C), clearly provides that an EIS must be accompanied by "the comments and views of the appropriate Federal, State, and local agencies, *which are authorized to develop and enforce environmental standards.*" (Emphasis added.)

Plaintiff claims that the foregoing provision required the Corps to solicit comments from the West Virginia Department of Agriculture.[22] (*See* Plf.'s Interrog. Ans. 14(d)(4), 14(f)(2), 15(a), 15(c) and 16; Plf.'s Brief, p. 10.)

 It is clear that comments and views need only be obtained from state agencies "which are authorized to develop and enforce environmental standards." The Plaintiff has cited nothing to the Court which would indicate that the West Virginia Department of Agriculture is authorized to develop and enforce environmental standards. And the Court, in its own research, has found nothing to indicate that the West Virginia Department of Agriculture has any general regulatory authority in the environmental field. (*See generally* W.Va. Code, Chapter 19.) Accordingly, the Court concludes that the NEPA did not impose any duty upon the Corps in this case to solicit comment from the West Virginia Department of Agriculture.[23]

---

21. Also, Plaintiff does not contest the fact that certain gas or oil wells in the project area will continue in production if the project is completed. Mr. Cingle supplemented his deposition with the following sworn statement:

 [T]here are 52 known oil, gas, storage and abandoned wells and dry holes below full pool. Of these 52, 15 have been satisfactorily plugged and abandoned; 30 will be plugged; and 7 active wells will be intermittently inundated but will be adjusted to accommodate the full pool of the project so that production can be continued. (Supp. to Cingle Dep., p. 4.)

22. Comments were obtained from the West Virginia Department of Natural Resources. (*See* EIS, pp. 13–14 and attachments.)

23. The Corps did solicit comments from the United States Department of Agriculture's Soil Conservation Service and, as a result, the EIS had a detailed account of the project's effect on agriculture in Lewis County, West Virginia. The EIS states:

 The West Fork River Basin contains one of the most important agricultural areas in northern West Virginia. The principal products are livestock, hay, grass, poultry and

E. *Scientific Literature.*

In Interrogatory Answer 14(b)(2), Plaintiff charges:

The E.I.S. is felt to be incomplete because . . . [s]cientific conclusions in the E.I.S. are not supported by references to relevant literature or field studies.

 In its brief, Plaintiff fails to cite any case law for the proposition that the EIS must cite scientific literature and refer to field studies. Also, Plaintiff rather curiously fails to claim that any particular scientific conclusion is faulty. The record here establishes that the EIS is underpinned by a diligent, good faith research effort by the Corps, which utilized effective scientific methods. *See Environmental Defense Fund v. Hardin,* 325 F.Supp. 1401, 1403 (D.D.C.1971). It is well settled that supporting studies and technical references need not be included in the EIS. However, these items should be available and accessible. *Trout Unlimited v. Morton,* 509 F.2d 1276, 1284 (9th Cir. 1974); *Life of the Land v. Brinegar,* 485 F.2d 460, 468–69 (9th Cir. 1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). Details of Corps studies concerning the project appear in the General Design Memorandum, dated January 1971. The GDM is, and has been, available at the public library in Weston, West Virginia, near the proposed dam site. (Cingle Dep., p. 13.) Detailed accounts of Corps studies and field investigations made for this project appear in another public document, the 1966 Report.

F. *Paragraph 14.*

 In the section of its brief entitled "PARAGRAPH 14", the Plaintiff concludes with an assortment of claims which expand upon paragraph 14 of the complaint, which reads:

The Environmental Impact Statement is as follows: vague; incomplete; misleading; erroneous; filed with perfunctory and conclusionary language; a non-reviewable environmental record in its present form; and/or in noncompliance with the requirements of 42 U.S.C. §§ 4321 et seq., and the guidelines prepared by the Council on Environmental Quality.

Plaintiff quarrels with the EIS' use of the 1950 flood as an example of the fact that the "Weston and Clarksburg, West Virginia . . . areas were damaged at least 15 times by floodwaters between February 1950 and December 1969." (EIS, p. 4; *see* Plf.'s Interrog. Ans. 14(c)(1).) The EIS continues:

In 1950, for example, in the Weston area alone, four industries, 167 commercial establishments, 595 residential dwellings, 9 churches and 10 schools suffered damages totaling more than two million dollars. (EIS, p. 4.)

According to Plaintiff, the 1950 flood is a misleading example because it was the worst flood of the century. However, reference to the 1950 flood is not misleading in light of the Corps' flood damage studies. At least one other flood of record, the July 1888 flood, was of a force nearly equal to the 1950 flood. In the 1966 Report the Corps estimates that a flood similar to the July 1888 flood would cause damages of "about $1,539,000 in the Weston damage district." (1966 Report, p. 31.) Also not to be overlooked is the fact that the total

dairy products. The most desirable farm and grazing lands are in the valleys, particularly those of the West Fork River and Skin Creek. The reach of Skin Creek in the project area is reported to be the second most important dairying area in Lewis County. Several of the farms to be acquired for project purposes contain over 150 acres. In all there are 132 farms, but many are worked only parttime. (EIS, p. 3.)

\* \* \* \* \* \*

The Soil Conservation Service points out that the proposed lake and developments would significantly reduce the agricultural productive capacity of the county. The project will remove about 10 percent of the total cropland and 16 percent of bottom land and terrace soils in the county from active agricultural use. (EIS, p. 6.)

\* \* \* \* \* \*

The loss of the cropland and pasture will reduce the agricultural production of Lewis County appreciably. (EIS, p. 7.)

The Court fails to see how the EIS could be more candid about the project's effect on agriculture.

average annual flood damage in the "Weston damage district" is estimated to be $656,200.00. (GDM, App. XIV, p. 2.) [24]

Plaintiff also claims that citing the 1950 flood is misleading because since that time watershed projects have been completed on two streams near Weston, Polk Creek and Stonecoal Creek. These projects, according to Plaintiff, should reduce flooding in Weston. Plaintiff, however, offers no hydrological or other technical data to support its assertion. Accordingly, the Corps' conclusion, based on flood damage data, that the two projects do not change the "potential damages" picture is not challenged with dependable particulars. According to the Corps, the work on Polk and Stonecoal Creek "cannot eliminate flooding in Weston" because those projects "only have an effect on a very small portion of the drainage area." (Cingle Dep., pp. 37–39, 46–47, 59–60.)

Accordingly, the Court concludes that the reference to the 1950 flood in the EIS is not misleading.

Plaintiff appears to claim (Brief, p. 12) that the EIS is misleading in its statement that "[a]pproximately 280 acres of rural land will be completely protected from flooding" (EIS, p. 4) because the project will cause 3,000 acres of crop land and 5,500 acres of pasture land to be condemned. This argument is frivolous because, as noted earlier in this memorandum, the EIS is quite frank in explaining the project's adverse effect on agricultural production in Lewis County. (See footnote 23, supra.)

Plaintiff claims that the statement in the EIS, page 7, that "Skin Creek and Sand Fork are periodically dry during the summer" is erroneous. Plaintiff counters with the Parker statement that "the only times these streams are known to have been dry is during a drought." (Parker Aff't, p. 3.) Initially, the statement about the two

streams is taken out of context by Plaintiff. In context, it appears in the EIS as follows:

Approximately 21 miles of stream fishing will be eliminated. (Fishing under present conditions is mostly limited to the West Fork River, since the major tributaries, *Skin Creek and Sand Fork are periodically dry during the summer.*) (Emphasis added.)

Plaintiff in no way disputes the inference that fishing is poor on *major* tributaries. Moreover, there seems to be no material difference between the statement in the EIS and the statement of Mr. Parker.

According to the EIS, "[t]he Stonewall Jackson Lake project is planned as one of the largest State parks in the [West Virginia] park system" (Page 5). Plaintiff asserts that the EIS erroneously claims (Brief, p. 12) that the "long term productivity of the area would be enhanced by the development of" the park area. (EIS, p. 10.) [25] In attacking this particular EIS statement, Plaintiff cites only a June 18, 1974, letter (Spray Aff't, Exh. B) written by the Director of the West Virginia Department of Natural Resources. The Director's letter indicates the following: (a) three West Virginia state parks are profitable in normal years of operation; (b) monthly interest on revenue bonds sold for park improvement is $64,482.00; (c) in fiscal 1973, the state spent $1,358,430.00 in operating state parks; and (d) 5,071,306 people used the state parks in 1973. The Director's letter does not present "facts showing that there is a genuine issue for trial." (F.R.Civ.P., 56(e).) Nothing in his letter materially cuts against the EIS statement that the park aspect of the project will enhance the "long term productivity of the area." Plaintiff appears to be saying that state parks are unprofitable and a financial drain on the state treasury. However, the EIS unquestionably goes beyond this limited issue in its presentation of the economic

---

**24.** The Corps defines the "Weston damage district" as "that area lying downstream of the [proposed] dam site located above Weston and extending to the upstream limits of Clarksburg." (1966 Report, p. 31.)

**25.** Plaintiff's complaints about the park aspects of the project are presented twice in its brief. See heading "B.", supra, dealing with short-term/long-term use.

question. The EIS clearly speaks of enhancement of the private sector of the economy:

The anticipated tourist trade will create increased demands for services, and open many opportunities for new commercial enterprises. (EIS, p. 6.)

\* \* \* \* \* \*

Interstate 79 could generate substantial recreation-oriented services in the vicinity. (EIS, p. 5.)

In any event, the issue of profitability is not one for this Court to consider.

■ The concluding attacks on the EIS in Plaintiff's brief relate to the following allegations which first appeared in Plaintiff's Interrogatory Answer 14(b):

3. The E.I.S. fails to give the effect of flow fluctuation on downstream biological productivity and stability.

4. The E.I.S. fails to give the effect of the intrusion of other fish species.

**26.** The first alleged deficiency which Plaintiff borrows from the *Gillham Dam* case is:

The E.I.S. fails to give the effects of flow fluctuation on downstream biological productivity and stability. (Plf.'s Interrog. Ans. 14(b)(3).)

In this case, the data developed by the Corps shows that the dam will reduce the extent of flow fluctuation downstream, thereby improving biology. For example, downstream fishing will be improved. According to the Department of the Interior's Fish and Wildlife Service,

Downstream from the dam streams [*sic*] flows will be improved due to reduced fluctuations and turbidities, but this alone will not provide a downstream fishery because released water would be too cold. [However,] [w]ith the incorporation of multiple-level outlets as planned, the downstream releases will produce a significant increase in the stream fishery. (1966 Report, p. 188.)

Plaintiff offers nothing to counter the assertion that the downstream environment will be stabilized by the project.

The second and third alleged deficiencies (which are closely related) also borrowed from the *Gillham Dam* case are:

The E.I.S. fails to give the effects of the intrusion of other fish species. (Plf.'s Interrog. Ans.. 14(b)(4).)

\* \* \* \* \* \*

The E.I.S. fails to give the effects of impoundment on existing food chains and downstream alluvial deposits. (Plf.'s Interrog. Ans. 14(b)(5).)

5. The E.I.S. fails to give the effects of impoundment of existing food chains and downstream alluvial deposits.

6. The E.I.S. fails to thoroughly give the effects of reservoir drawdowns on shoreline vegetation.

These alleged deficiencies are lifted almost verbatim from those listed by the plaintiff in the so-called *Gillham Dam* case, *Environmental Defense Fund v. Corps of Eng. of U. S. Army,* 325 F.Supp. 728, 747–48 (E.D.Ark. 1971). Apart from the fact that the geography of the area surrounding the Gillham Dam site is quite different from the Stonewall Jackson dam site, Plaintiff here fails to advance any factual support for its assertions. In the *Gillham Dam* case, the four assertions were supported by considerable expert testimony. This Court must not invalidate an EIS on the strength of bald assertions borrowed from another case. Moreover, the four contentions are dealt with in the EIS to the extent they are applicable to the present project.[26]

To the extent that the subjects in these assertions have any relevance to this project, they are dealt with in the EIS. The EIS states (p. 7):

The ecological systems functioning within the stream and along its banks will be exchanged for systems associated with a slack water environment.

In addition, the EIS lists the fish species presently in the streams (page 2) and the species which are expected to populate the lake when the project is finished (page 6). Unlike the *Gillham Dam* case, Plaintiff here has not advanced any facts which raise a question about rich, alluvial deposits downstream, and raising this contention in this case is nothing more than an irrelevant distraction.

The fourth complaint which Plaintiff lifts from the *Gillham Dam* case is this:

The E.I.S. fails to thoroughly give the effects of reservoir drawdowns on shoreline vegetation. (Plf.'s Interrog. Ans. 14(b)(6).)

The Court would balance Plaintiff's total failure to advance facts to support this allegation against the full discussion in the EIS, which follows:

Releases from the lake for water quality control and water supply purposes will usually result in a falling water level during the summer months. The starting date and rate of fall of the water surfaces will depend to a large extent on the precipitation and runoff condition at the time. The receding water level will expose areas of bare soil around the periphery of the lake. The widths of these

To summarize the judicial survey of the challenged EIS, the Court is satisfied that the EIS is adequate and meets the full-disclosure standards and requirements of NEPA. The affidavits and documents submitted by Plaintiff totally fail to "set forth specific facts showing that there is a genuine issue for trial". (Rule 56(e), F.R.Civ.P.)

A full study of the EIS (including its attachments) and the entirety of the record clearly show that the potential environmental impacts were thoroughly revealed and discussed and that the bases for the various conclusions in the EIS are sufficiently documented. In particular, the range of alternatives considered is adequate. The main text of the EIS is concise and in easily readable form, which should give any non-professional an understanding of the project's environmental impact. The supporting material, particularly the 1966 Report and the GDM, provide the more inquisitive or sophisticated reader with a detailed technical basis for the conclusions in the EIS. Accordingly, the Court concludes that the EIS is a document upon which a decision maker could arrive at an informed determination.

## II. THE SECOND CAUSE OF ACTION.

■ The issues presented in the second cause of action have not been seriously advanced in these summary judgment proceedings. The gist of this cause of action appears in paragraph 19 of the complaint:

The decision of the defendants to undertake the said project is not in substantial compliance with the goals Congress declared in 42 U.S.C. 4321 et seq.

To keep the ultimate issues in proper perspective, it must be noted that it was not the nominal Defendants who made the basic decision to undertake the complained of project. It was the Congress, after many years of study, who determined that the Stonewall Jackson Lake Project should be initiated.

In response to Interrogatory 18(a) Plaintiff says that the project violates the Congressional goals which appear as follows in 42 U.S.C. § 4331(b)(3) and (4):

it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

\* \* \* \* \* \*

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice; . . .

In Interrogatory 18(b), Defendants asked:

What is the factual basis for plaintiff's conclusion that the decision to undertake

---

areas will depend on the slope of the bank as well as the vertical drop in the water level. Except for the upper end of the main arm of the lake and the upper ends of the larger tributaries, the banks exposed by lake drawdown are generally steep and the exposure will not be extensive due to the fact that the expected drawdown is only 7.2 feet from May through October of an average rainfall year. Fortunately, where the upstream bottomlands will be exposed, they are narrow, so the exposure will not be excessive. Areas subject to annual inundation and exposure are unlikely to develop a mature terrestrial flora or a mature aquatic flora. Early invad-

er species should characterize the flora whether the areas are exposed or inundated. The animal species that can be expected to frequent these areas include those terrestrial, aquatic and amphibious species able to find food and cover to their liking. There will be fewer terrestrial than aquatic and amphibious species. A copy of the summer season drawdown schedule is attached [to the EIS]. (EIS, pp. 7–8.)

From the foregoing, the Court concludes that the drawdown problem and its relationship to shoreline vegetation received more than adequate treatment in the EIS.

the project violated the goals of Congress.

Plaintiff responded:

1. It is the plaintiff's belief that a watershed project in the proposed affected area would attain many of the benefits attributed to the dam but it will not inundate the political, social, economic and historical background of the affected inhabitants.

2. The dam would remove existing archaelolgical [*sic*] sites and other places of historical significance and destroy the culture of the inhabitants of the area. (Plf.'s Interrog. Ans. 18(b).)

The Court has already determined that the omission of the watershed alternative from the EIS raises no "genuine issue for trial," and that discussion will not be repeated here.

Plaintiff offers no facts to dispute the EIS statement that "[t]here are no known historical sites of significance" in the project area. The EIS does report that "eighteen sites of archeological interest were located in the project area." (EIS, p. 3.) Further, according to the EIS, "arrangements will be made to search for and remove any prehistoric artifacts of significance." (EIS, p. 4.) The EIS also assesses the project's effect on the social and cultural setting of this area:

Four small towns will be affected by the development, Roanoke, Vandalia, Brownsville and Walkersville. Roanoke is the largest, with a population of around 100. Improvements in the valleys include one active school, five churches, ten commercial establishments and a fire hall. The population in the towns is about one-third of the total population in the project area. (EIS, p. 3.)

\* \* \* \* \* \*

Some of the area inhabitants who are required to move from the project area will resettle in the vicinity. Those who at present support themselves in vocations other than farming will very likely keep their jobs, unless project operation or occupations satellited on operation of the project offer better opportunities. On the other hand, it is not as likely that individuals engaged in agricultural pursuits will re-establish themselves on farms, both because of the relative scarcity of good farmland, and the probable reluctance to start over again. . . .

The project will cause a change in the social life of the area. Small rural communities and scattered farms will give way to a large transient population looking for recreation and relaxation. (EIS, p. 6.)

The EIS clearly apprised Congress of the project's impact on the inhabitants of the area and openly acknowledged the effect on the social and cultural setting. Congress has specifically declared that NEPA policy be carried out in a manner "consistent with other essential considerations of national policy." (42 U.S.C. § 4331(b).) Congress had the facts; it thereupon decided the policy questions and voted to establish the lake.

Plaintiff's "Second Cause of Action" raises no triable issue.

## III. THE THIRD CAUSE OF ACTION.

The crux of Plaintiff's third cause of action is as follows:

The defendants proceeding forth with said project and with the attached Environmental Impact Statement violates the rights of the plaintiff as guaranteed by the Fifth and Ninth Amendments to the United States Constitution and by [42] U.S.C. 4321 et seq. (Compl., par. 20.)

 The Court has determined earlier in this memorandum that NEPA, 42 U.S.C. § 4321 *et seq.* has been complied with in this case. In addition, this Court has previously held, and holds here, that claims about environmental degradation cannot be elevated to Constitutional levels. *Hagedorn v. Union Carbide Corporation*, 363 F.Supp. 1061, 1064–65 (N.D.W.Va.1973). *Accord, Ely v. Velde,* 451 F.2d 1130 (4th Cir.

1971). Therefore, the third cause of action also falls short.[27]

Finally, some brief observations are needed to fully conclude the Court's review of the questions presented in this litigation.

First, it appears to the Court that Plaintiff's aim is simply and solely to stop the Stonewall Jackson Lake Project. After studying in detail all the material offered by Plaintiff, including its brief, the Court is convinced that Plaintiff will always oppose any determination that the lake be established as planned. The broadsides directed at the EIS, many of which lack even one whit of arguable support in the record, demonstrate that Plaintiff's real complaint goes not to the adequacy of the EIS itself, but to the merits of developing a federal reservoir and recreation project which will consume 21,000 acres in Lewis County, West Virginia.

Of course, the Court does not belittle the concerns of those who will be displaced if the project becomes a reality. Neither has the Corps minimized these concerns, as the EIS indicates:

> Development of the project will have a negative effect on many of the present human inhabitants. In other similar areas, the loss of homes, churches and cemeteries, hallowed by close and sometimes traditional association, has generated understandable protest. The loss is irrevocable because the original is destroyed. (EIS, p. 7.)

Second, even though Plaintiff's case necessitated a tedious and time-consuming analysis of the EIS and the remainder of the record, it is abundantly clear that the Courts are not the place to stop or alter public works projects.

 Third, NEPA, in a case such as this, does not empower the courts to pass on the substantive merits or demerits of federal projects and thereby to politically second guess Congressional action. Instead, the nearly exclusive purpose of NEPA is to assure that the responding federal agency, in this case the Corps, makes full and responsible disclosure of environmental factors to Congress, or, in a given case, some Executive Branch decision maker.

Finally, the best, most acceptable, plan for providing flood control and utilization of water resources in the West Fork basin was a judgment matter exercised here after long and detailed study by the Congress, and this Court must not, under such circumstances as here presented, interpose its judgment. If the decision to construct the Stonewall Jackson dam is reversed or modified, this must be solely by action in the Congress.

For the reasons appearing in this memorandum, it is

ORDERED that the Clerk of this Court file the document entitled *West Fork River and Tributaries, West Virginia,* S.Doc.No. 109, 89th Cong., 2d Sess. (1966); it is further

ORDERED that summary judgment be, and is, entered in favor of the Defendants and against the Plaintiff; and it is further

ORDERED that this action be, and is, dismissed and retired from the docket of this Court.

---

**27.** Plaintiff did not press the Constitutional claims in its summary judgment papers.